UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ALHASSANE DIALLO,<br><br>  Petitioner,<br><br>  v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY et al.,<br><br>  Respondents. | CASE NO. 2:26-cv-01249-TL<br><br>ORDER ON PETITION FOR WRIT OF HABEAS CORPUS |

This matter is before the Court on Petitioner Alhassane Diallo's Amended Petition for Writ of Habeas Corpus and Request for Injunctive Relief. Dkt. No. 14. Petitioner is presently detained at the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington. Having reviewed the petition, Respondents' Return (Dkt. No. 15), Petitioner's Traverse (Dkt. No. 19), and the relevant record, the Court GRANTS IN PART and DENIES IN PART the petition.

## I.   BACKGROUND

**A.   Petitioner**

**1.   Petitioner's Personal Background**

Petitioner Alhassane Diallo is a citizen of Guinea. Dkt. No. 14-4 (Diallo Decl.) ¶ 1. Petitioner was born April 21, 1998, in Conakry, the capital of Guinea. *Id.* Between 2010 and

2021 (*id*. ¶¶ 2, 3), Petitioner's father served as the "neighborhood chief" for Petitioner's neighborhood in Conakry, a position Petitioner describes as having been bestowed as "a reward for [Petitioner's father's] faithfulness to" the Rally of the Guinean People ("RPG," after its French acronym), the political party of the Guinean president at that time (*id*. ¶ 2). On September 5, 2021, the RPG government was overthrown in a coup d'etat and replaced by a military junta known as the CNRD. *Id.* ¶¶ 3, 4.

Beginning in January 2022, after Petitioner's father organized and participated in a "peaceful demonstration" in Conakry against alleged misdeeds of the junta, the CNRD targeted Petitioner's father as a "troublemaker." *Id.* ¶¶ 4–7. On February 15, 2022, "heavily armed" men stormed Petitioner's family's house in Conakry. *Id.* ¶ 8. Petitioner's father fled, but the men threatened Petitioner's family, raped Petitioner's sister, and beat Petitioner and took him into detention on the presumption jailing Petitioner might convince his father to come out of hiding. *Id.* ¶¶ 9, 10. Petitioner was imprisoned for more than 17 months. *Id.* During his incarceration, Petitioner was tortured. *Id.* ¶¶ 10–11. He was prevented from contacting his family. *Id.* ¶ 11. Petitioner avers that his captors told him that he had been imprisoned in place of his father, whom the CNRD government intended to imprison and kill. *Id.*[1]

Approximately 11 months into his detention, Petitioner contracted malaria. *Id.* ¶¶ 12, 14. On July 3, 2023, after Petitioner's cellmates became concerned that Petitioner had died, Petitioner was taken to a hospital in Conakry for treatment. *Id.* ¶ 12. Petitioner avers that he "was unconscious the entire time [he] was in the hospital." *Id.* ¶ 13. But soon after he arrived at the hospital in Conakry, his uncle—who was at the hospital where Petitioner was taken and

---

[1] On June 2, 2024, Petitioner's father, who had fled to Côte d'Ivoire, was arrested and extradited to Guinea. Dkt. No. 14-4 ¶ 21. Petitioner learned that his father died on June 17, 2024, although Petitioner's family has been unable to get any information about how his father died, or where he is buried. *Id.* ¶ 23.

recognized him as his nephew—coordinated Petitioner's escape from the hospital in Conakry to Senegal. *Id.* ¶¶ 13–14. In Senegal, Petitioner recovered from his illness and determined to flee Africa for the United States. *See id.* ¶¶ 16, 17. Petitioner feared that Guinean authorities would locate him in Senegal, because "Senegal and Guinea are members of ECOWAS[2] and there is information sharing" between the states. *Id.* ¶ 15.

On July 19, 2023, the same day he left the hospital in Senegal, Petitioner flew to Nicaragua, then made his way through Honduras, Guatemala, and Mexico and into the United States. *Id.* ¶ 16. After his initial encounter with United States immigration authorities and subsequent arrest in California, *see infra* Section II.A.2, Petitioner was released; he ultimately settled in Tacoma, Washington, where he has relatives. Dkt. No. 14-2 (Dokey Decl.) at 1.

On or about December 13, 2024, the Seattle Police Department arrested Petitioner and charged him with assault in the fourth degree. Dkt. No. 9 (Jeon Decl.) ¶ 6. No Party has advised the Court on the disposition of this charge.

### 2.    Petitioner's Immigration Background[3]

On or about August 2, 2023, United States Border Patrol encountered Petitioner near San Diego, California. *See* Dkt. No. 18-1 (Record of Deportable/Inadmissible Alien) at 3. Petitioner reportedly admitted to having "illegally cross[ed] the international boundary without being inspected by an immigration officer at a designated Port of Entry." *Id.*; *see also* Dkt. No. 18-2 (Warrant for Arrest of Alien) at 2. The Department of Homeland Security ("DHS") issued

---

[2] Economic Community of West African States. *See, e.g.*, *Republic of Libera v. Bickford*, 787 F. Supp. 397, 399 (S.D.N.Y. 1992). There are 15 members of ECOWAS: Benin, Burkina Faso, Cabo Verde, Côte d'Ivoire, The Gambia, Ghana, Guinea, Guinea Bissau, Liberia, Mali, Niger, Nigeria, Senegal, Sierra Leone, and Togo. "Member States," *available at*: https://www.ecowas.int/member-states [https://perma.cc/62RL-FU7T].

[3] Many of the facts recounted here are based on hearsay contained within narrative portions of documents from Petitioner's immigration record, or on the declaration of Deportation Sooseon Jeon, who does not claim to have firsthand personal knowledge of most of the facts therein (*see* Dkt. No. 9 (Jeon Decl.) ¶ 2). The Court makes no findings as to whether these are true and correct statement of fact but does note that they appear to be uncontested by the Parties.

ORDER ON PETITION FOR WRIT OF HABEAS CORPUS – 3

Petitioner a Notice to Appear ("NTA") that charged him as being subject to removal pursuant to Section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(6)(A)(i), as a "[noncitizen] present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General." Dkt. No. 14-5 (NTA) at 1. That same day, United States Customs and Border Protection ("CBP") released Petitioner from custody on an Order of Release on Recognizance ("OREC"). Dkt. No. 9 ¶ 5; *see* Dkt. No. 18-3 (OREC) at 2. Upon his release, Petitioner relocated to Tacoma. Dkt. No. 14-2 at 1.

On December 11, 2023, Petitioner timely filed a Form I-589, Application for Asylum and for Withholding of Removal, with the immigration court. *Id.* On April 1, 2025, the Seattle Immigration Court entered a removal order in absentia against Petitioner, who had failed to appear at his master hearing. Dkt. No. 9 ¶ 7; Dkt. No. 14-2 at 1. Upon Petitioner's motion, however, the immigration court re-opened Petitioner's case the next day and, on July 17, 2025, Petitioner appeared for a master hearing in Seattle Immigration Court. Dkt. No. 14-2 at 1. Petitioner is scheduled for an individual hearing on February 10, 2027. *Id.*

On or about August 18, 2025, United States Immigration and Customs Enforcement ("ICE") arrested Petitioner during a routine OREC check-in. *Id.*; *see* Dkt. No. 18-5 (Warrant for Arrest of Alien) at 2. Petitioner was detained and transferred to NWIPC. Dkt. No. 18-4 (Record of Deportable/Inadmissible Alien) at 3–4; Dkt. No. 18-6 (Notice of Custody Determination) at 2.

On November 17, 2025, an immigration judge ("IJ") ordered Petitioner removed to Guinea. Dkt. No. 14-6 (Order of IJ) at 3. The IJ denied Petitioner asylum but granted Petitioner withholding of removal to Guinea. *Id.* at 1; *see* 8 C.F.R. §§ 208.33, 1208.33 ("Lawful pathways condition on asylum eligibility"). After the IJ's decision, Petitioner remained detained at NWIPC. *See* Dkt. No. 14-2 at 1.

ORDER ON PETITION FOR WRIT OF HABEAS CORPUS – 4

On or about April 10, 2026, ICE advised Petitioner that it intended to remove him to Ghana, after Ghana had "accepted [Petitioner] as a third-country national removal[.]" Dkt. No. 8 (Schultz Decl.) ¶ 4; *see* Dkt. No. 14-2 at 1. On or about April 11, 2026, ICE transferred Petitioner to the East Montana detention facility in El Paso, Texas. Dkt. No. 14-3 (Second Dokey Decl.) at 1. On April 12, 2026, ICE transferred Petitioner to the Winn Correctional Center in Winnfield, Louisiana. *Id.* On or about April 15, 2026, ICE transferred Petitioner to the Alexandria Staging Facility in Alexandria, Louisiana. *Id.* at 1–2. On or about April 17, 2026, ICE transferred Petitioner to the Richwood Correctional Center in Monroe, Louisiana. *Id.* at 2. On April 22, 2026, ICE transferred Petitioner to the Florence Service Processing Center in Florence, Arizona. *Id.* And on April 23, 2026, ICE transferred Petitioner for the sixth and final time, this time back to the NWIPC in Tacoma. *Id.*

Before and during Petitioner's circuitous journey from Washington, to Texas, to Louisiana, to Arizona, and back to Washington, Petitioner filed a petition for writ of habeas corpus (Dkt. No. 1) and a motion for a temporary restraining order ("TRO") (Dkt. No. 4).[4] Each sought, in part, to prevent Petitioner's removal from the United States. On April 14, 2026, the Court provisionally granted the TRO and prohibited Respondents from removing Petitioner from the United States until the Court authorized them to do so. *See* Dkt. No. 5 (minute order). On April 17, 2026, after considering briefing from the Parties, the Court, among other things, extended the prohibition on Petitioner's removal from the United States. Dkt. No. 11 at 3. On April 21, 2026, the Parties submitted a stipulated briefing schedule that set deadlines for Petitioner to file an amended habeas petition, and for Respondents to file a return (Dkt. No. 12);

---

[4] Petitioner originally filed his petition at 12:13 p.m. PDT on April 11, 2026, when Petitioner was detained at NWIPC. Dkt. No. 1. Fourteen minutes later, Petitioner was transferred out of NWIPC. Dkt. No. 9 ¶ 15. Because Petitioner was detained at a facility located within this District when he filed his petition, this Court has jurisdiction over the matter. *See Rumsfeld v. Padilla*, 542 U.S. 426, 442–44 (2004) (discussing "district of confinement" rule).

the Court imposed the schedule the next day (Dkt. No. 13). On April 27, 2026, Petitioner filed his amended petition (Dkt. No. 14), and on May 4, 2026, Respondents filed their return (Dkt. No. 15). On May 11, 2026, Petitioner filed a traverse. Dkt. No. 19. Finally, on May 14, 2026, the Court—having noted that Respondents advised in their Return brief that they intended to remove Petitioner to Sierra Leone on or about May 19, 2026, in contravention of the Court's order(s) prohibiting Petitioner's removal (*see* Dkt. No. 15 at 7–8)—ordered that Respondents not remove Petitioner from the United States before receiving the Court's authorization to do so. Dkt. No. 20.

**B.      Respondents**

Respondents[5] are DHS; Bruce Scott, the Warden of NWIPC; Julio Hernandez, Director the Seattle Field Office of ICE; Markwayne Mullin, Secretary of Homeland Security; and Todd Blanche, Acting United States Attorney General. Dkt. No. 14 at 1.

**II.      LEGAL STANDARD**

**A.      Habeas Petition Legal Standard**

"Writs of habeas corpus may be granted by . . . the district courts . . . within their respective jurisdictions." 28 U.S.C. § 2241(a). Habeas petitioners must prove by a preponderance of the evidence that they are entitled to relief, *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)—that is, that they are "in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2241(c).

**B.      Injunctive Relief Legal Standard**

A petitioner "seeking a permanent injunction . . . must demonstrate: (1) that he has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

---

[5] As used in this Order, "Respondents" does not include Respondent Scott, who has not appeared in this matter.

inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Prongs three and four of the *eBay* factors merge when the Government is the party opposing the issuance of injunctive relief. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Ninth Circuit has held that a permanent injunction is appropriate where the party can demonstrate it is likely to suffer irreparable injury. *See City & County of San Francisco v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018) ("An injunction is appropriate when the party seeking relief demonstrates that . . . it is likely to suffer irreparable injury that cannot be redressed by an award of damages").

### III.    DISCUSSION

Petitioner generally seeks two forms of relief: a prohibition on his removal to a third country (Counts I, II, and IV) and release from detention (Count III).

**A.    Requests for Injunctive Relief Related to Third-Country Removal**

**1.    Petitioner's Ability to Seek Relief in this District**

Respondents argue that Petitioner is a member of the certified class in *D.V.D. v. Department of Homeland Security*, No. C25-10676, 2025 WL 942948, at *1 (D. Mass. Mar. 28, 2025), and, therefore, must obtain the third-country-removal-related relief he seeks in that case, in that district. *See* Dkt. No. 15 at 15–16. Courts have repeatedly rejected this argument, and the Court will not re-explain its deficiencies here. *See, e.g.*, *Palacios Obregon v. Blanche*, No. C26-484, 2026 WL 1223424, at *7 (W.D. Wash. May 5, 2026); *Escobar v. Chestnut*, No. C25-1801, 2026 WL 622121, at *5–6 (E.D. Cal. Mar. 5, 2026), *report and recommendation adopted as modified by* 2026 WL 1069797 (Apr. 20, 2026); *Jimenez-Perez v. Bondi*, No. C25-2631, 2026 WL 445560, at *4 (W.D. Wash. Feb. 17, 2026); *Sanchez v. Bondi*, No. C25-2573, 2026 WL

160882, at *4–5 (W.D. Wash. Jan. 21, 2026). But Petitioner's "due process claim is not identical to the claims at issue in the *D.V.D.* class action—Petitioner argues that due process requires he have a meaningful opportunity to seek withholding of removal, a claim not at issue in *D.V.D.* (which concerns claims under the Convention Against Torture). . . . Nor does Petitioner's habeas petition raise a complaint to systemic relief for [detainees fearing third-country removal] generally." *Nguyen v. Scott*, 796 F. Supp. 3d 703, 730 (W.D. Wash. 2025).

####        2.        Third-Country Removal

Under the INA, removal to a third country is permissible *only* if it is "impracticable, inadvisable, or impossible" to remove a noncitizen to: (a) the country the noncitizen has designated for removal; (b) the country of which the noncitizen is a subject, national, or citizen; (c) the country from which the individual was admitted to the United States, or which contains the port from which they disembarked for the United States or a contiguous territory; or (d) the noncitizen's country of birth (or the country that now contains their birthplace) or immediate previous residence. 8 U.S.C. § 1231(b)(2)(E). Under such circumstances, the government may remove the noncitizen to "another country whose government will accept [them] into that country." *Id.* § 1231(b)(2)(E)(vii). Even then, the government may not remove any person to a country where they will be persecuted or tortured. *Id.* § 1231(b)(3)(A); 8 C.F.R. §§ 208.16, 1208.16. Where third-country removal is anticipated, due process requires, *inter alia*, notice of the country to which the noncitizen will be removed that is not be provided "last minute," but instead with sufficient time for the noncitizen to have a meaningful opportunity to apply for fear-based protection from removal. *Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir. 1999). Courts in this District have found, and this Court agrees, that such notice must consist of "written notice of the country being designated" and "the statutory basis for the designation, i.e., the applicable subsection of § 1231(b)(2)," and that the noncitizen must be affirmatively asked whether they

fear persecution or harm upon removal to the third country, with their response memorialized in writing. *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1019 (W.D. Wash. 2019).

If a noncitizen claims fear of removal to a designated third country, courts in this District have repeatedly held that ICE must give the petitioner an opportunity "to pursue [a] claim for withholding of deportation in reopened removal proceedings before an immigration judge." *Abubaka v. Bondi*, No. C25-1889, 2025 WL 3204369, at *6 (W.D. Wash. Nov. 17, 2025); *see also Arenado-Borges v. Bondi*, No. C25-2193, 2025 WL 3687518, at *6 (W.D. Wash. Dec. 19, 2025) (collecting cases). These district court cases are not binding, but Respondents offer no reason the Court should not follow them. The Court finds the reasoning in *Aden* persuasive and concludes that before Petitioner may be removed to a third country, he must be given written notice and an opportunity to respond, and—if he has a fear of persecution or torture—reopened removal proceedings before an Immigration Judge. Petitioner argues that Respondents' third-country removal procedures, as laid out in DHS's July 9, 2025, memorandum, do not comport with due process. *See* Dkt. No. 14 ¶¶ 59–60. As discussed above, courts in this District and Circuit have agreed, holding repeatedly that those procedures fall far short of what is required by due process. *See, e.g.*, *Rea-Hernandez v. Bondi*, No. C25-2609, 2026 WL 322874, at *9 (W.D. Wash. Feb. 6, 2026) ("Alarmingly, this policy provides that "[i]f the United States has received diplomatic assurances from the country of removal that [noncitizens] removed from the United States will not be persecuted or tortured, and if the Department of State believes those assurances to be credible, the [noncitizen] may be removed *without the need for further procedures*."); *Francisco Lorenzo v. Bondi*, No. C25-2660, 2026 WL 237501, at *9–10 (W.D. Wash. Jan. 29, 2026) (finding that Respondents' third-country removal policy, as described in the July 9, 2025, memorandum, "simply do[es] not comport with due process"); *Escobar v. Chestnut*, No. C25-1801, 2025 WL 3687639, at *4 (E.D. Cal. Dec. 19, 2025) ("Courts across this circuit

ORDER ON PETITION FOR WRIT OF HABEAS CORPUS – 9

have found that ICE's policy, as described in the March and July Memoranda, is likely unconstitutional and contrary to Ninth Circuit precedent." (collecting cases)). The Court will not spend more time repeating the reasons for these holdings here, except to reiterate that the widely circulated DHS policy does not inspire confidence that Respondents can be relied upon to afford Petitioner with a statutorily and constitutionally sufficient process absent an order from this Court.

For their part, Respondents make a categorical argument that DHS's third-country removal process does not violate Petitioner's due process. As explained above, however, Respondents' argument has been considered and rejected multiple times by multiple courts; Respondents' respectful disagreement (*see* Dkt. No. 15 at 17) with this conclusion is, without more, insufficient to persuade the Court of the policy's legitimacy.

\*       \*       \*

Petitioner predicates his request for injunctive relief regarding third-country removal on two different Constitutional bases—Due Process, as provided in the Fifth Amendment (Dkt. No. 14 ¶¶ 76–79), and the prohibitions against extrajudicial punishment and cruel and unusual punishment, as respectively provided for in the Fifth and Eighth Amendments (*id.* ¶¶ 82–84). The Court considers each basis separately and applies the *eBay* factors to determine whether Petitioner is entitled to the injunctive relief he seeks.

### a.       Third-Country Removal Without Due Process

As to the first *eBay* factor, Respondents intend to remove Petitioner to Sierra Leone, a state with which the United States "ha[s] entered into a Third Country Removal Agreement." Dkt. No. 15 at 12. Under this agreement, "Sierra Leone provided diplomatic assurances that [noncitizens] removed from the United States pursuant to the Third Country Removal agreement will not be subjected to persecution or torture as part of this agreement." *Id.* Respondents assert

ORDER ON PETITION FOR WRIT OF HABEAS CORPUS – 10

that the State Department "determined that these diplomatic assurances were credible." *Id.* Under existing DHS policy, where a third country "ha[s] provided such an assurance, 'the alien may be removed without the need for further procedures.'" *Id.* at 11 (quoting U.S. Dep't of Homeland Security, "Guidance Regarding Third Country Removals," at 1–2). Respondents assert that "Sierra Leone has accepted Petitioner as a third-country national removal pursuant to the Third Country Removal agreement," and that, "[a]bsent a stay of removal, ICE intends to remove Petitioner on or around May 19, 2026." *Id.* at 12.[6]

Respondents assert further that removal to Sierra Leone does not jeopardize Petitioner's life or liberty, because Sierra Leone has offered assurances not to persecute or torture him. *See* Dkt. No. 15 at 11, 12, 18. The Court is not persuaded that that such assurances sufficiently diminish Petitioner's vulnerability.

The particular facts of this case demonstrate Petitioner's marked and justifiable fear of refoulement or repatriation to Guinea by other means. Petitioner has plausibly demonstrated that, owing to his late father's political affiliation, the governing regime in Guinea intends to do him harm. Indeed, Petitioner testifies credibly that it already has. He has also shown that re-settlement in a different West African nation does not offer him adequate protection from the Guinean regime. After escaping Guinea to Senegal, Petitioner fled Senegal because he feared that Senegal would collaborate with Guinea to repatriate him there. Dkt. No. 14-4 ¶ 15. Petitioner feared repatriation from Senegal to Guinea because of the close proximity of the two countries, and because both states are members of ECOWAS, an organization in which member states share information with one other. *Id.* ¶ 15.

---

[6] In orders dated April 14, 2026, April 17, 2026, April 22, 2026, and May 14, 2026, the Court prohibited Respondents from removing Petitioner from the United States without prior authorization from the Court. Dkt. Nos. 5, 11, 13, 20.

ORDER ON PETITION FOR WRIT OF HABEAS CORPUS – 11

And Petitioner's fear is not limited to Senegal. Like Senegal, Côte d'Ivoire is a member of the ECOWAS bloc, in which member states cooperate with each other. *Id.* ¶ 21. As discussed above, *see supra* Section I.A.1, Petitioner asserts that on June 2, 2024, his father went to a government office in Côte d'Ivoire to obtain his driver's license and never returned. *Id.* When Petitioner's mother went to ask about her husband, she was told that Petitioner's father had been arrested and extradited to Guinea as a fugitive. *Id.* When Petitioner's hometown neighbor went to the central prison in Conakry to inquire about Petitioner's father, he was informed that Petitioner's father had died on June 17, 2024, just 15 days after being returned to the country from Côte d'Ivoire. *Id.* ¶ 23. Prison officials would not reveal Petitioner's father's cause of death or where he had been buried. *Id.* Given the Guinean government's demonstrated and stated intent to treat Petitioner as proxy for his father, it is a reasonable presumption that Petitioner's safety would be compromised in any location where his father would have been unsafe. As demonstrated by the record, this includes within states, such as ECOWAS members, that exchange information about purported "fugitives" and "cooperate with each other." Dkt. No. 14-4 ¶ 21.

Petitioner asserts his fear of being removed to Sierra Leone "for very similar reasons that he fears being removed to Ghana." Dkt. No. 19 at 7. Given the experience of both Petitioner and Petitioner's father, Sierra Leone's no-persecution and no-torture assurances do not address the situation at hand.[7] Respondents do not offer any argument or authority to suggest that refoulement and repatriation are included under the umbrella of persecution or torture for the purposes of Sierra Leone's "diplomatic assurances," giving the Court significant doubts that the

---

[7] For this reason, Respondents' reliance on *Munaf v. Green*, 553 U.S. 674 (2008), is inapt here. Dkt. No. 15 at 18.

ORDER ON PETITION FOR WRIT OF HABEAS CORPUS – 12

"diplomatic assurances" on which Respondents rely will be effective in safeguarding Petitioner's life and liberty.

Petitioner indicates a fear that removal to any state within the ECOWAS bloc would render his subsequent location there by Guinean authorities inevitable, given the "information sharing" and cooperation between member states. Dkt. No. 14-4 ¶¶ 15, 21. The INA bars Respondents from removing Petitioner to a country where "[his] life or freedom would be threatened . . . because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see Lanza v. Ashcroft*, 389 F.3d 917, 933 (9th Cir. 2004). The statutory language does not identify the specific source of the threat, and a fair interpretation of the statute does not require that the threat be endemic to the country of removal. In Petitioner's case, that Petitioner's freedom and life are not immediately threatened by actors within Sierra Leone does not mean that Petitioner's removal there is harmless. The threat is merely an extradition or refoulement away, a thin degree of separation that the Court cannot in good conscience ignore, especially given the specific facts in this case. Given the potential for refoulement and the threat to Petitioner's life and liberty that such an outcome represents, the Court finds that Petitioner has established the first *eBay* factor. *See City & County of San Francisco*, 897 F.3d at 1243.

As to the second factor, it is patently clear that monetary damages could not remediate the harm posed by Petitioner's return to Guinea and immediate, subsequent injury. *See, e.g.*, *Sagastizado v. Noem*, 802 F. Supp. 3d 992, 1014 (S.D. Tex. 2025) (in consideration of request for injunctive relief, finding irreparable harm where petitioner faced "removal to a country in which he may face persecution and subsequent refoulement to El Salvador").

As to the merged third and fourth factors, in light of such serious harm to Petitioner, the balance of equities tips steeply in his favor, because his interest in avoiding imprisonment,

ORDER ON PETITION FOR WRIT OF HABEAS CORPUS – 13

torture and, potentially, death, outweighs the minimal burden on Respondents of providing notice and an opportunity to be heard if they wish to remove him. Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) (citation modified). Under these circumstances, injunctive relief is appropriate.[8]

**b.      Third-Country Removal as Impermissibly Punitive**

In addition to the procedural concerns discussed above, Petitioner further alleges that his potential third-country removal pursuant to Respondents' current policy would violate the Eighth Amendment's prohibition of cruel and unusual punishment, the Fifth Amendment's prohibition of extrajudicial punishment, and the long-established rule, dating to *Wong Wing v. United States*, 163 U.S. 228 (1896), that no "infamous punishment" in addition to deportation may be imposed for immigration violations without a proper criminal trial. Dkt. No. 14 ¶ 70.

In support of this argument, Petitioner asserts that it has been reported that Respondents have "attempted—and completed—an 'end-run' around the protections of the Convention Against Torture by deporting a group of migrants to Ghana, which sent them on to their countries of citizenship despite fears of persecution." *Id*. ¶ 63. Petitioner alleges that the Trump administration has hand-picked countries known for human rights abuses and instability for its deportations, in an attempt to spread fear and deter immigration, and that hundreds of noncitizens have been removed to third countries only to be met with mistreatment and summary, sometimes indefinite, detention. *Id.* ¶ 64. Petitioner substantiates these allegations with news reports (*see,*

---

[8] Petitioner's requested relief that, upon his expression of fear of removal to a given third country, "DHS may not effect removal for at least fifteen days to allow Petitioner a meaningful opportunity to investigate and contest removal to the newly designated third country" (Dkt. No. 14 at 23–24) is not predicated upon any existing authority. The Court thus declines to provide it.

ORDER ON PETITION FOR WRIT OF HABEAS CORPUS – 14

*e.g.*, Dkt. No. 14-8, 14-9, 14-10, 14-11, 14-12, 14-13, 14-14, 14-15) and sworn declarations, three of which are from individuals whom Respondents removed to Ghana (*see* Dkt. No. 14-16).

Declarant K.S. obtained deferral of removal to The Gambia under the Convention Against Torture ("CAT"). Dkt. No. 14-16.[9] ICE removed K.S. to Ghana, where they were subsequently detained, then repatriated to The Gambia, where they "[are] now living in hiding[.]" *Id.* Declarant E.A. was granted deferral of removal to Nigeria under CAT. *Id.* ICE removed E.A. to Ghana, where they were initially detained, then repatriated to Nigeria by way of Togo. *Id.* E.A. is now "in hiding in Nigeria." *Id.* Declarant D.A. was granted withholding of removal to Nigeria. *Id.* ICE removed D.A. to Ghana, where, at the time they made their declaration, they were imprisoned. *Id.*

This evidence is material and relevant. "Newspaper articles are classic hearsay and, in a court of law, cannot be relied upon for the truth of the statements made therein." *Musk v. OpenAI, Inc.*, 769 F. Supp. 3d 1017, 1026 (N.D. Cal. 2025). Even so, the Court notes that Respondents do not deny the substance of these articles. And "courts in this district and across the country have recognized that Petitioner is correct: the government is intentionally removing individuals to countries where they will be imprisoned." *Nguyen v. Bondi*, 2025 WL 3534168, at *9 (citing *Nguyen*, 796 F. Supp. 3d at 734 (collecting cases)). More importantly, the declarations that Petitioner has provided have been attested to under penalty of perjury. These constitute competent evidence about the peril that accompanies third-country removals to Ghana.

This case differs from others where a habeas petitioner has drawn the Court's attention to Ghanaian removals for the purpose of demonstrating *generally* that Respondents' third-country removal policy is unconstitutionally punitive. *See, e.g.*, *Kamleshan v. Blanche*, No. C26-908,

---

[9] The page numbers of Docket No. 14-16 are illegible.

2026 WL 1194600, at *10 (W.D. Wash. May 1, 2026); *Rea-Hernandez v. Bondi*, No. C25-2609, 2026 WL 322874, at *10 (W.D. Wash. Feb. 6, 2026); *Elshourbagy v. Bondi*, 817 F. Supp. 3d 1102, 1116–17 (W.D. Wash. 2025). Unlike in those cases, where references to the Ghanaian removals demonstrated alleged inequities in the third-country removal process writ large, third-country removals to Ghana are especially relevant to Petitioner here. For one thing, Petitioner was—prior to the Court's issuance of a temporary restraining order—mere days, if not hours, away from boarding a flight to Ghana in execution of his third-country removal. *See* Dkt. No. 14-3 at 1–2. For Petitioner, then, the Ghanaian "end-run" looms as something quite different than merely a frightening possibility. Moreover, geography and politics render Ghana particularly problematic for Petitioner. The geographic distance between Ghana and Guinea, the state to which Petitioner cannot be removed, is considerably less than the distance between Ghana and the relevant states in those other cases—Solomon Islands in *Kamleshan*, Venezuela in *Rea-Hernandez*, and Egypt in *Elshourbagy*. Indeed, the geographic scale is far more similar to the cases of Declarants K.S., E.A., and D.A., who were respectively protected from removal to The Gambia, Nigeria, and Nigeria. The refoulement of Declarant D.A. from Ghana to Nigeria, for example, was effectuated via taxicab. *See* Dkt. No. 14-16. The Guinean frontier is similarly accessible from Ghana by automobile, and Guinea is closer to Ghana than is The Gambia, K.S.'s ultimate destination. Moreover, as discussed above, Petitioner has expressed a particular fear for his safety predicated on "information sharing" among the member states of ECOWAS, which includes Ghana and Guinea. Dkt. No. 14-4 ¶ 15. Respondents do not provide any information, beyond their repeated recitation of "diplomatic assurances," that Petitioner's fears are unwarranted or baseless. Where the ultimate purpose here, as ordered by the immigration court via withholding of removal, is to prevent Petitioner from being repatriated to Guinea—a state whose government has already subjected him to 17 months of imprisonment and torture—

ORDER ON PETITION FOR WRIT OF HABEAS CORPUS – 16

Respondents must do better than point to "diplomatic assurances" that *other* countries will not persecute or torture him. In light of the evidence presented by Petitioner, Respondents make no meaningful representation that either Ghana's or Sierra Leone's respective "diplomatic assurances" can or will protect Petitioner from the harm that awaits him in Guinea.

Given the dire stakes here—on the record before it, the Court cannot presume that Petitioner will *not* be imprisoned, tortured, or killed should he be returned to Guinea—the testimony of individuals who were removed to Ghana, and the realities of the proximity between Ghana and Guinea, the Court is compelled to conclude, in the abundance of caution, that removal to Ghana (or, for that matter, to Sierra Leone, another member of ECOWAS) is substantially similar to a prohibited removal to Guinea such that it would constitute a constructive removal to that state. *See* Dkt. No. 14-4 ¶¶ 15, 21–22; *see also supra* n.2. Put another way, if the purpose of withholding Petitioner's removal to Guinea is to protect him from threats to his life and liberty, then the record leads the Court to the conclusion that such purpose is significantly jeopardized if Petitioner is removed to Ghana or Sierra Leone.

The remaining three *eBay* factors fall the same way as they do in the Court's prior analysis. *See supra* Section III.A.1. No monetary award could remedy the harm potentially faced by Petitioner, the balance of equities tips in favor of Petitioner, and it remains in the public's interest to prevent the violation of Petitioner's constitutional rights. Under these circumstances, injunctive relief is appropriate.

**B.    Habeas Corpus Claim**

Under the Due Process Clause of the Fifth Amendment to the United States Constitution, no person shall be "deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. The Fifth Amendment guarantee of due process applies to removal proceedings. *Torres-Aguilar v. I.N.S.*, 246 F.3d 1267, 1270 (9th Cir. 2001). In addition, the

ORDER ON PETITION FOR WRIT OF HABEAS CORPUS – 17

Supreme Court has held that "the Due Process Clause protects [a noncitizen] subject to a final order of deportation . . . ." *Zadvydas v. Davis*, 533 U.S. 678, 693–94 (2001) (citing *Wong Wing v. United States*, 163 U.S. 228, 238 (1896)).

### 1.    Legal Framework for Detention Under the INA

As a noncitizen with a final order of removal, Petitioner is detained under 8 U.S.C. § 1231. Under Section 1231(a)(1), "when [a noncitizen] is ordered removed, the Attorney General shall remove the [noncitizen] from the United States within a period of 90 days (in this section referred to as the 'removal period')." 8 U.S.C. § 1231(a)(1)(A). Section 1231(a)(2) mandates the detention of the noncitizen during the removal period. *Id.* § 1231(a)(2)(A). Finally, Section 1231(a)(6) authorizes the continued detention of noncitizens after the expiration of the removal period:

> [A noncitizen] ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by [the Secretary of Homeland Security][10] to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

*Id.* § 1231(a)(6).

There is no temporal limit on the length of detention in the statute, and the Supreme Court noted in *Zadvydas* that 90 days is not intended to be a statutory maximum, reasoning:

> While an argument can be made for confining any presumption to 90 days, we doubt that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time. We do have reason to believe, however, that Congress previously doubted the constitutionality of detention for more than six months."

---

[10] Although 8 U.S.C. § 1231 refers to "the Attorney General" as having responsibility for detention and removal of noncitizens, the Homeland Security Act of 2002, Pub. L. No. 107-296 § 441(2), 116 Stat. 2135, 2192 (2002), transferred this authority to the Secretary of the Department of Homeland Security. *See also* 6 U.S.C. § 251.

ORDER ON PETITION FOR WRIT OF HABEAS CORPUS – 18

533 U.S. at 701 (citing Juris. Statement in *United States v. Witkovich,* O.T. 1956, No. 295, at 8–9.)

The *Zadvydas* Court held that the INA does not authorize "indefinite, perhaps permanent, detention" of noncitizens subject to final orders of removal under Section 1231(a)(6), *id.* at 699, instead construing the statute to contain an "implicit 'reasonable time' limitation," *id.* at 682. "[F]or the sake of uniform administration in the federal courts," the Supreme Court recognized six months as that time limitation. *Id.* at 701. It found that if a statute were to permit indefinite detention of a noncitizen, that would "raise a serious constitutional problem" under the Fifth Amendment's Due Process Clause. *Id*. at 690. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Id*.

Ultimately, the Supreme Court determined that it is "presumptively reasonable" for DHS to detain a noncitizen for six months following entry of a final removal order while it works to remove the individual from the United States. *Id.* at 701. However, "[a]fter this 6-month period, once the [noncitizen] provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* If the Government fails to rebut the noncitizen's showing, the noncitizen is entitled to habeas relief. *Id*.

## 2.    The Length of Detention Remains Presumptively Reasonable

Here, the IJ entered Petitioner's removal order on November 17, 2025. Dkt. No. 14-6 at 4. It became administratively final on December 17, 2025.[11] Petitioner has therefore been detained for less than six months, and the detention is presumptively reasonable. *See Zadvydas*, 533 U.S. at 701. Petitioner has not presented any facts or described any circumstances to rebut the presumption that his approximately five-month post-removal order detention has not been unreasonably lengthy. Although their efforts to remove Petitioner to a third country have thus far been unsuccessful, Respondents have demonstrated diligence in attempting to effectuate removal, having made inquiries to Costa Rica, Panama, and Australia as early as December 18, 2025, just one day after the removal order became final. Dkt. No. 9 ¶ 11. And although judicial rejection of Respondents' third-country removal policy has rendered such removal more procedurally complicated, it has not made it categorically impossible. Even so, "if the detention continues beyond the presumptively reasonable 6-month period, the burden will shift, and Petitioner's likelihood of winning on the merits will improve." *Vo v. Warden, Adelanto ICE Detention Facility*, No. C26-1467, 2026 WL 1123472, at *3 (C.D. Cal. Apr. 20, 2026).

## 3.    Petitioner's Unlawful Re-Detention Claim is Untimely

Finally, Petitioner argues in his Traverse that his August 2025 re-detention violated his due process rights. *See* Dkt. No. 19 at 9–13. Because Petitioner's ongoing detention is unlawful, Petitioner argues, "[o]nly his immediate release remedies that ongoing violation." *Id.* at 13.

---

[11] Petitioner asserts that his removal order became administratively final on November 17, 2025, the date it was entered. Dkt. No. 14 ¶ 28. Relevant here, however, a removal order does not become final until the noncitizen waives their appeal, or upon the "expiration of the time allotted for an appeal if the [noncitizen] does not file an appeal within that time." 8 C.F.R. § 1241.1(b)–(c). Here, Petitioner reserved his appeal. *See* Dkt. No. 14-5 at 4. His deadline to appeal was December 17, 2025. *Id.* There is no indication that Petitioner filed an appeal, or that Petitioner waived appeal before that date. Therefore, by operation of the regulation, Petitioner's removal order became final on December 17, 2025.

ORDER ON PETITION FOR WRIT OF HABEAS CORPUS – 20

Petitioner's argument is procedurally improper. "A Traverse is not the proper pleading to raise additional grounds for relief." *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1997); *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."); *see Esquivel-Ipina v. LaRose*, 812 F. Supp. 3d 1073, 1082 (S.D. Cal. 2025) (declining to consider arguments raised for the first time in traverse). The Court therefore will therefore not consider the constitutionality of Petitioner's August 2025 re-detention.

In any event, "'[t]o the extent Petitioner challenges his pre-final removal order detention, such a claim is moot' because the basis for his detention changed when the order of removal became final." *Borroto v. Scott*, No. C26-409, 2026 WL 709775, at *2 (W.D. Wash. Mar. 13, 2026) (quoting *Zakarneh v. United States Immigr. & Customs Enf't*, C25-707, 2026 WL 73825, at *4 (W.D. Wash. Jan. 9, 2026)); accord *Fernandez v. Scott*, No. C26-43, 2026 WL 607761, at *3 (W.D. Wash. Mar. 4, 2026); *see also, e.g.*, *Inamzhon v. Warden of Golden State Annex*, No. C25-1059, 2025 WL 3080525, at *2–3 (E.D. Cal. Nov. 3, 2025) (finding claims moot when the basis for detention changed); *Alier D. v. Sec'y of Dep't of Homeland Sec.*, Case No. C18-1645, 2018 WL 5847244, at *2 (D. Minn. Nov. 8, 2018) ("The shift of the government's authority to detain the petitioner from § 1226 to § 1231 renders moot his claim based on pre-removal detention.").

As Petitioner's detention now flows from that final order of removal (*see* Dkt. No. 14-6) and is mandatory under Section 1231(a)(2), the Court need not consider whether the arrest that began his detention under Section 1226(a) was unlawful or whether detention under that provision became unreasonably prolonged at any point. The question presented by a habeas petition is whether Petitioner *is* in custody in violation of the Constitution or laws or treaties of the United States, and the Court has found that he is not.

ORDER ON PETITION FOR WRIT OF HABEAS CORPUS – 21

## IV.   CONCLUSION

Accordingly, Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. No. 14) is GRANTED IN PART and DENIED IN PART. It is hereby ORDERED:

(1) Respondents and all their officers, agents, employees, attorneys, and persons acting on their behalf or in concert with them:

    (a) are PROHIBITED from removing Petitioner to any third country without notice and a meaningful opportunity to respond in reopened removal proceedings before an Immigration Judge.

    (b) are PROHIBITED from removing Petitioner to any third country where it is more likely than not that Petitioner will be subsequently repatriated to Guinea.

(2) Petitioner's request that he be immediately released from detention is DENIED.

(3) Petitioner's motion for temporary restraining order (Dkt. No. 4) is DENIED AS MOOT.

(4) Any motion requesting fees should be filed within the deadlines set by the Equal Access to Justice Act, 28 U.S.C. § 2412.

Dated this 29th day of May 2026.

Tana Lin
United States District Judge

ORDER ON PETITION FOR WRIT OF HABEAS CORPUS – 22